Manuel SERVIN–ESPINOZA, Petitioner–Appellee,

v.

John ASHCROFT, Attorney General; Charles Demore, Respondents–Appellants.

No. 01–16225.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 14, 2002.

Filed Nov. 5, 2002.

---

James Todd Bennett, El Cerrito, CA, for the petitioner-appellee.

Donald E. Keener and Alison R. Drucker, Office of Immigration Litigation, Washington, DC, for the respondents-appellants.

Before THOMPSON, W. FLETCHER and BERZON, Circuit Judges.

## OPINION

WILLIAM A. FLETCHER, Circuit Judge:

Lawful permanent resident Manuel Servin–Espinoza was ordered deported to Mexico after conviction of an aggravated felony. The district court granted Servin–Espinoza's petition for writ of habeas corpus on the ground that enforcing § 440(d) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104–132, 110 Stat. 1214 (1996), which bars discretionary relief under former § 212(c) of the Immigration and Nationality Act ("INA"), against deportable aliens but not excludable aliens violated the equal protection component of the Due Process Clause

during the time period in question. For the reasons that follow, we affirm.

## I. Background

Servin–Espinoza is a citizen of Mexico and a lawful permanent resident of the United States. In 1996, Servin–Espinoza pled guilty to possession of methamphetamine for sale. The Immigration and Naturalization Service ("INS") charged him with deportability under INA former § 241(a)(2)(A)(iii), 8 U.S.C. former § 1251(a)(2)(A)(iii), for conviction of an aggravated felony after entry into the United States. The Immigration Judge ("IJ") ordered Servin–Espinoza deported to Mexico on September 18, 1998.

On May 14, 1997, prior to Servin–Espinoza's deportation hearing, the Board of Immigration Appeals ("BIA") issued a published decision in *In re Fuentes–Campos*, 1997 WL 269368, 21 I. & N. Dec. 905 (BIA 1997), holding that AEDPA § 440(d), which barred discretionary relief previously available under INA former § 212(c), 8 U.S.C. § 1182(c), operated against aliens in deportation proceedings but not those in exclusion proceedings. As a result, Servin–Espinoza was not eligible for § 212(c) relief during his deportation proceedings, but would have been had he been in exclusion proceedings.

On June 7, 1999, we decided *United States v. Estrada–Torres*, 179 F.3d 776 (9th Cir.1999), overruled on other grounds by *United States v. Rivera–Sanchez*, 247 F.3d 905 (9th Cir.2001). Like Servin–Espinoza, Estrada–Torres was a legal permanent resident who was ordered deported after conviction of an aggravated felony; he also was denied § 212(c) relief under AEDPA § 440(d). Unlike Servin–Espinoza, however, Estrada–Torres was ordered deported before *Fuentes–Campos* was decided, and thus before the BIA held that excludable aliens could seek § 212(c) relief even after the enactment of AEDPA § 440(d). By the time we heard Estrada–Torres' petition for review, the BIA had decided *Fuentes–Campos*. Estrada–Torres argued that depriving deportable but not excludable aliens of the opportunity to apply for § 212(c) relief, under the BIA's interpretation of § 440(d), violated equal protection. We held in *Estrada–Torres* that: 1) the BIA's interpretation of AEDPA § 440(d) and INA § 212(c) in *Fuentes–Campos* was contrary to the meaning of the statute; 2) the statute denies relief to both deportables and excludables and thus does not violate equal protection on its face; and 3) because Estrada–Torres was denied § 212(c) relief by the IJ before *Fuentes–Campos* had been decided (and thus before the BIA treated deportables and excludables differently with respect to discretionary relief), the statute had not been unconstitutionally applied to him.[1] *See also Armendariz–Montoya v. Sonchik*, 291 F.3d 1116(9th Cir.2002) (rejecting identical equal protection challenge). We left open, however, the question whether the statute would be unconstitutionally applied in a case where a deportable alien was denied § 212(c) relief between the time of the BIA's decision in *Fuentes–Campos* and our decision in *Estrada–Torres*.

---

**1.** We recognize that a circuit split regarding the proper reading of AEDPA § 440(d) has developed in the wake of *Estrada–Torres*. This circuit is alone in holding that § 440(d) treats excludable and deportable aliens equally. *See Domond v. INS*, 244 F.3d 81 (2d Cir.2001) (affirming *Fuentes–Campos'* reading of AEDPA § 440(d)); *Asad v. Reno*, 242 F.3d 702 (6th Cir.2001) (same); *Almon v. Reno*, 192 F.3d 28 (1st Cir.1999) (same); *Requena–Rodriguez v. Pasquarell*, 190 F.3d 299 (5th Cir.1999) (same); *Jurado–Gutierrez v. Greene*, 190 F.3d 1135 (10th Cir.1999) (same); *LaGuerre v. Reno*, 164 F.3d 1035 (7th Cir.1998) (same). Whatever its view of the correctness of *Estrada–Torres*, this three-judge panel is bound to follow it.

Servin–Espinoza's case presents that open question, for he was ordered deported by the IJ in the window of time between *Fuentes–Campos* and *Estrada–Torres.* Servin–Espinoza appealed his deportation order to the BIA, raising among other issues an equal protection challenge to the denial of § 212(c) relief to deportables but not excludables. The BIA dismissed his appeal on September 25, 2000, stating that it lacked "jurisdiction to rule on the constitutionality of the Immigration and Nationality Act and the regulations we administer."

Servin–Espinoza then filed a petition for a writ of habeas corpus in federal district court. He again raised the argument that AEDPA § 440(d) violates "his Fifth Amendment rights to due process, equal protection, and fundamental fairness." The district court found an as-applied equal protection violation against Servin–Espinoza, and granted the habeas corpus petition. The district court stated that it was bound to follow our decision in *Tapia–Acuna v. INS,* 640 F.2d 223 (9th Cir.1981), which it characterized as holding that a distinction between legal permanent residents in deportation and exclusion proceedings lacks a rational basis. The district court then stayed Servin–Espinoza's deportation and ordered the government to provide Servin–Espinoza with a hearing before an IJ on an application for waiver under § 212(c). The government timely appealed.

## II. Discussion

Servin–Espinoza contends that the INS policy of granting to excludable aliens the opportunity to apply for § 212(c) relief but denying to deportable aliens that same opportunity violated the equal protection component of the Due Process Clause of the Fifth Amendment. We review constitutional questions *de novo. See S.D. Myers, Inc. v. City and County of San Francisco,* 253 F.3d 461, 466 (9th Cir.2001).

There is no question that during the window of time between *Fuentes–Campos* and *Estrada–Torres* the INS intentionally and systematically treated aliens in exclusion proceedings more favorably than those in deportation proceedings, by allowing the former and not the latter to apply for § 212(c) relief. The government does not dispute this, but it argues that a rational basis existed for the difference in treatment. The government offers three reasons to justify the difference: 1) denying relief to deportables but not excludables encourages criminal aliens already in the United States to leave voluntarily; 2) criminal aliens at large in the United States pose a greater threat than those abroad seeking to return; and 3) at the time of AEDPA's enactment, the number of criminal aliens in deportation proceedings was ten times the number in exclusion proceedings; concerned that criminal aliens were abusing § 212(c) relief in order to forestall their removal, Congress could hasten the removal of most criminal aliens from the country by eliminating the discretionary relief for deportables.

If the question before us were whether a congressionally created distinction between excludable and deportable aliens with respect to § 212(c) relief is rational, we might well agree with several of our sister circuits that the distinction could successfully withstand an equal protection challenge, based on the reasons advanced by the government. *See Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (Congress's power to regulate the exclusion or admission of aliens is extremely broad); *Perez–Oropeza v. INS,* 56 F.3d 43, 45 (9th Cir.1995) ("statutory restrictions which limit relief from deportation to certain classes of aliens are valid unless wholly irrational") (internal quota-

tion marks omitted). We are not convinced that our decision in *Tapia–Acuna* (adopting equal protection analysis of *Francis v. INS*, 532 F.2d 268 (2d Cir. 1976)) would require a different result. *See, e.g., DeSousa v. Reno*, 190 F.3d 175, 183–84 (3d Cir.1999) (assuming without deciding that AEDPA § 440(d) creates a distinction between excludable and deportable aliens with respect to the availability of § 212(c) waivers, and finding no equal protection violation: "A careful reading of *Francis* ... reveals that it did not directly concern distinctions between excludable and deportable aliens, but rather addressed disparate treatment of groups of deportable aliens."); *accord Domond v. INS*, 244 F.3d 81 (2d Cir.2001); *Asad v. Reno*, 242 F.3d 702 (6th Cir.2001); *Almon v. Reno*, 192 F.3d 28 (1st Cir.1999); *Requena–Rodriguez v. Pasquarell*, 190 F.3d 299 (5th Cir.1999); *Jurado–Gutierrez v. Greene*, 190 F.3d 1135 (10th Cir.1999); *La-Guerre v. Reno*, 164 F.3d 1035 (7th Cir. 1998). *See also Armendariz–Montoya*, 291 F.3d at 1122–23.

However, because of our reading of AEDPA § 440(d) in *Estrada–Torres*, that is not the question before us. As we interpreted § 440(d) in *Estrada–Torres*, Congress treated excludable and deportable aliens equally, not differently, with respect to the availability of relief under § 212(c). That is, neither category of aliens is eligible to receive it. *See* 179 F.3d at 779. Whatever the reasons might be for granting excludable aliens the opportunity to apply for § 212(c) relief while denying the same opportunity to deportable aliens, Congress did not have those reasons in mind when it enacted the statute. Under our interpretation of § 440(d) in *Estrada–Torres*, the reasons advanced by the government for the difference in treatment could not have been Congress's reasons, for the simple fact that Congress did not intend that difference.

We are thus faced with an equal protection challenge to an administrative policy that violated a statutory command. Such a challenge is unusual but not without precedent. The Supreme Court's decisions in *Allegheny Pittsburgh Coal Co. v. County Commission of Webster County*, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989), and *Nordlinger v. Hahn*, 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992), are instructive. *Allegheny Pittsburgh* involved an equal protection challenge to the assessment policies of the Webster County, West Virginia, tax assessor. The Constitution and laws of West Virginia required that all property taxes be uniformly assessed based on the property's current market value. Despite this clear mandate, the Webster County tax assessor assessed recently purchased land according to the purchase price, while making only minor upward adjustments to assessed values of land that had not been recently purchased. "This approach systematically produced dramatic differences in valuation between petitioners' recently transferred property and otherwise comparable surrounding land." 488 U.S. at 341, 109 S.Ct. 633. A unanimous Supreme Court made no inquiry into possible reasons for the difference in treatment and held, without substantial analysis, that the difference violated equal protection:

> [T]he fairness of one's allocable share of the total property tax burden can only be meaningfully evaluated by comparison with the share of others similarly situated relative to their property holdings. The relative undervaluation of comparable property in Webster County over time therefore denies petitioners the equal protection of the law.

*Id.* at 346, 109 S.Ct. 633.

Three years later, in *Nordlinger*, the Court addressed a similar taxing practice in California. This time, however, the

practice did not violate state law; rather, it was required by state law. Here, where the practice was required rather than forbidden, the Court employed the usual equal protection analysis, relying on any rational basis that the voters of California could have had when they adopted the law:

> We have no difficulty in ascertaining at least two rational or reasonable considerations of difference or policy that justify denying petitioner the benefits of her neighbor's lower assessments. First, the State has a legitimate interest in local neighborhood preservation, continuity, and stability .... Second, the State legitimately can conclude that a new owner at the time of acquiring his property does not have the same reliance interest warranting protection against higher taxes as does an existing owner.

505 U.S. at 12, 112 S.Ct. 2326.

The case before us is like *Allegheny* rather than *Nordlinger.* In the window of time between *Fuentes–Campos* and *Estrada–Torres,* the INS, in violation of our interpretation of § 440(d), systematically favored excludables over deportables. This difference in treatment was not isolated or sporadic. *Compare Chan v. Reno,* 113 F.3d 1068, 1074(9th Cir.1997) (rejecting equal protection challenge when the INS treated another alien more favorably: "Any other conclusion would create an absurd result: whenever the INS granted an alien relief to which he was not entitled, any future attempts to apply the law correctly would generate an equal protection claim."). Rather, the difference was based on a policy formally announced in *Fuentes–Campos* and consistently followed until we decided *Estrada–Torres.* (Indeed, so far as we are aware, the INS continues to follow the *Fuentes–Campos* policy in all circuits except ours.)

■ *Allegheny Pittsburgh* does not tell us precisely what standard of rationality is required under equal protection to justify a systematic difference in treatment when that difference violates a statutory command, but it is at least clear that the standard is substantially less forgiving than when the difference in treatment is statutorily required. We do not believe that it is critical in this case that the standard be stated with precision, for under any standard except the most lenient the difference is not justifiable. Our immigration law has generally treated aliens who are already on our soil (and who are therefore deportable) more favorably than aliens who are merely seeking admittance (and who are therefore excludable). *See Alvarez–Mendez v. Stock,* 941 F.2d 956, 962 (9th Cir.1991) (describing the more favorable treatment of deportables relative to excludables as an "accepted tenet[ ] of U.S. immigration law"); *see also Zadvydas v. Davis,* 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (aliens inside the United States are entitled to greater constitutional protection than those outside the geographic borders). To reverse this normal preference in favor of deportables would require more justification than the slender (indeed, to be frank, somewhat far-fetched) reasons the government has advanced in this case. *See Tapia–Acuna; Francis.* We recognize that such reasons may suffice when advanced to support a distinction drawn by Congress; but where, as here, they are advanced to support a distinction that Congress has not drawn but rather forbidden, they do not. For the INS intentionally and systematically to allow excludables to apply for § 212(c) relief while denying the same relief to deportables would seem to contravene equal protection in the same way that "intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property."

*Allegheny,* 488 U.S. at 345, 109 S.Ct. 633(quotation marks omitted).

■ The question of remedy remains. The government argues that even if Servin–Espinoza's equal protection rights were violated, a remedy allowing him the opportunity to apply for § 212(c) relief is improper. The proper remedy, the government suggests, would be to enforce the statute as written against deportable aliens such as Servin–Espinoza by denying § 212(c) relief, and also denying such relief to the excludable aliens to whom it was wrongly granted before our decision in *Estrada–Torres.* But Servin–Espinoza does not argue that his statutory rights have been violated; it is clear that they have not been. Rather, he argues that his equal protection rights have been violated. A remedy for that violation must provide equality of treatment. Because it is not feasible to go back and retroactively deny the § 212(c) relief that was wrongly granted to excludable aliens before *Estrada–Torres,* the only feasible way to provide equal treatment to Servin–Espinoza is to give him the same opportunity to apply for § 212(c) relief that excludable aliens were given.

The Court's decision in *Allegheny Pittsburgh* makes it clear that this is the right answer. After the Court held that the difference in tax treatment violated equal protection, it went on to consider whether the petitioners (who had been taxed according to the current value of their property, in accordance with West Virginia law) could constitutionally be limited to the remedy of seeking to raise the assessment of others (whose property had been undervalued, in violation of West Virginia law):

> Viewed in isolation, the assessments for petitioners' property may fully comply with West Virginia law. But the fairness of one's allocable share of the total property tax burden can only be meaningfully evaluated by comparison with the share of others similarly situated relative to their property holdings....

A taxpayer in this situation may not be remitted by the State to the remedy of seeking to have the assessments of the undervalued property raised. "The [Equal Protection Clause] is not satisfied if a State does not itself remove the discrimination, but imposes on him against whom the discrimination has been directed the burden of seeking an upward adjustment of the taxes of other members of the class."

488 U.S. at 346, 109 S.Ct. 633 (citation omitted). In this case, as in *Allegheny Pittsburgh,* the proper remedy under the equal protection guarantee is to provide equality of treatment. Because we cannot turn back the hands of time and erase the favorable treatment of excludable aliens, the only feasible way to remedy the discrimination suffered by Servin–Espinoza is to grant him the same opportunity to apply for § 212(c) relief that was systematically granted to excludable aliens between the time of *Fuentes–Campos* and *Estrada–Torres.*

### Conclusion

We hold that the application of AEDPA § 440(d), which barred § 212(c) relief against deportable but not excludable aliens during the time period between *Fuentes–Campos* and *Estrada–Torres,* violated the equal protection rights of Servin–Espinoza. We therefore AFFIRM the order of the district court granting the writ of habeas corpus.